FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

# Feb 18, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CRISELDA D.,[1] <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting Commissioner of Social Security, <br><br> Defendant. | No.   4:20-cv-5239-EFS <br><br> **ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS AND DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF** |

Plaintiff Criselda D. appeals the denial of benefits by the Administrative Law Judge (ALJ). Because the ALJ failed to adequately explain and support several key findings, the Court grants summary judgment in favor of Plaintiff, denies the Commissioner's motion for summary judgment, reverses the decision of the ALJ, and remands this case for further proceedings.

## I.   Five-Step Disability Determination

A five-step sequential evaluation process is used to determine whether an adult claimant is disabled.[2] Step one assesses whether the claimant is engaged in

---

[1] For privacy reasons, the Court refers to every social security plaintiff by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] 20 C.F.R. §§ 404.1520(a), 416.920(a).

substantial gainful activity.[3]  If the claimant is engaged in substantial gainful activity, benefits are denied.[4]  If not, the disability evaluation proceeds to step two.[5]

Step two assesses whether the claimant has a medically severe impairment or combination of impairments that significantly limit the claimant's physical or mental ability to do basic work activities.[6]  If the claimant does not, benefits are denied.[7]  If the claimant does, the disability evaluation proceeds to step three.[8]

Step three compares the claimant's impairment or combination of impairments to several recognized by the Commissioner as so severe as to preclude substantial gainful activity.[9]  If an impairment or combination of impairments meets or equals one of the listed impairments (a "listing"), the claimant is conclusively presumed to be disabled.[10]  If not, the disability evaluation proceeds to step four.

Step four assesses whether an impairment prevents the claimant from performing work he performed in the past by determining the claimant's residual

---

[3] *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[4] *Id.* §§ 404.1520(b), 416.920(b).

[5] *Id.* §§ 404.1520(b), 416.920(b).

[6] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[7] *Id.* §§ 404.1520(c), 416.920(c).

[8] *Id.* §§ 404.1520(c), 416.920(c).

[9] *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[10] *Id.* §§ 404.1520(d), 416.920(d).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 2

functional capacity (RFC).[11]  If the claimant can perform past work, benefits are denied.[12]  If not, the disability evaluation proceeds to step five.

Step five, the final step, assesses whether the claimant can perform other substantial gainful work—work that exists in significant numbers in the national economy—considering the claimant's RFC, age, education, and work experience.[13] If so, benefits are denied.  If not, benefits are granted.[14]

The claimant has the initial burden of establishing he is entitled to disability benefits under steps one through four.[15]  At step five, the burden shifts to the Commissioner to show the claimant is not entitled to benefits.[16]

## II.    Factual and Procedural Summary

In August 2016, Plaintiff filed Title II and Title XVI applications for a period of disability and disability insurance benefits, alleging an onset date of November 1, 2012.[17]

---

[11] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[12] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[13] *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Kail v. Heckler*, 722 F.2d 1496, 1497–98 (9th Cir. 1984).

[14] 20 C.F.R. §§ 404.1520(g), 416.920(g).

[15] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

[16] *Id.*

[17] AR 22, 243.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 3

### A.    Plaintiff's Alleged Impairments & the Resulting Denials

Plaintiff initially asserted disability based on "bad knees," bilateral carpal tunnel syndrome (CTS), high blood pressure, and depression.[18]  By the time of the administrative hearing, Plaintiff also asserted disability based on fibromyalgia.[19]

Plaintiff's claims were denied initially and upon reconsideration.[20] Administrative Law Judge Mark Kim presided over the requested administrative hearing.[21]  At the hearing, Plaintiff and an independent vocational expert provided testimony.

### B.    The ALJ's Five-Step Findings

In the written decision denying Plaintiff's disability claims, the ALJ found as follows:

- Insured Status—June 30, 2014, was Plaintiff's date last insured.[22]  The ALJ found the relevant periods to be "November 1, 2012 through June 30, 2014 and August 23, 2016 onward."[23]

---

[18] *See* AR 99, 282.

[19] *See, e.g.*, AR 48.

[20] AR 22, 95–103, 118–133.

[21] AR 32.

[22] AR 22, 24.

[23] AR 22.  Neither party challenges the ALJ's findings regarding the relevant period.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 4

- Step One—Plaintiff had not engaged in substantial gainful activity since November 1, 2012, the alleged onset date.[24]

- Step Two—Between November 1, 2012, the alleged onset date, and the date last insured, June 30, 2014, Plaintiff did not have any severe impairments.  After August 23, 2016, the date on which Plaintiff filed her applications, she had the following medically determinable severe impairments: "bilateral knee osteoarthritis; bilateral carpal tunnel syndrome; fibromyalgia; and obesity."[25]

- Step Three—Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.[26]

- RFC—Plaintiff had the RFC to perform light work with the following limitations:

  o She is "limited to standing and/or walking four hours in an eight-hour workday."

  o She must be able to "alternate between sitting and standing on hourly basis for five minutes."

  o "She can never crouch, crawl, or climb ladders or scaffolds."

  o She can "occasionally stoop and kneel."

---

[24] AR 25.

[25] AR 25.

[26] AR 27.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 5

○ She is limited to "less than occasionally climbing flights of stairs."

○ "She can frequently handle, finger, and feel objects with her hands bilaterally."

○ She "must avoid extreme cold temperatures and unprotected heights."[27]

- Step Four—Plaintiff was unable to perform any past relevant work.[28]

- Step Five—Considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as cashier II, ticket seller, and marking clerk.[29]

The ALJ concluded Plaintiff had not been under a disability, as defined in the Social Security Act ("the Act"), from November 1, 2012, through the date of the ALJ's decision: April 8, 2020.[30]  Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied review.[31]  Plaintiff then timely appealed to this Court, primarily asserting that several of the ALJ's findings in the written decision lacked sufficient analysis and explanation.

---

[27] AR 28.

[28] AR 31.

[29] AR 32–33.

[30] AR 31.

[31] AR 1–7.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 6

1

### III.    Standard of Review

2      A district court's review of the Commissioner's final decision is limited.[32]

3  The Commissioner's decision is set aside "only if it is not supported by substantial

4  evidence or is based on legal error."[33]   Substantial evidence is "more than a mere

5  scintilla but less than a preponderance; it is such relevant evidence as a reasonable

6  mind might accept as adequate to support a conclusion."[34]   Moreover, because it is

7  the role of the ALJ and not the Court to weigh conflicting evidence, the Court

8  upholds the ALJ's findings "if they are supported by inferences reasonably drawn

9  from the record."[35]   The Court considers the entire record as a whole.[36]

10      Further, the Court may not reverse an ALJ decision due to a harmless

11  error.[37]   An error is harmless "where it is inconsequential to the ultimate

12

13

14

_____

15  [32] 42 U.S.C. § 405(g).

16  [33] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

17  [34] *Id.* at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

18  [35] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

19  [36] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must

20  consider the entire record as a whole, weighing both the evidence that supports and

21  the evidence that detracts from the Commissioner's conclusion," not simply the

22  evidence cited by the ALJ or the parties.) (cleaned up).

23  [37] *Molina*, 674 F.3d at 1111.

1  nondisability determination."[38]  The party appealing the ALJ's decision generally

2  bears the burden of establishing harm.[39]

### IV.    Analysis

Plaintiff alleges the ALJ erred by (1) "improperly evaluating the medical

opinion evidence"; (2) "failing [at step three] to conduct an adequate analysis,

failing to even consider Listing 14.09D in accordance with SSR 12-2p for

fibromyalgia"; rejecting Plaintiff's subjective complaints; and "failing to conduct an

adequate analysis at step five."[40]  For the reasons discussed below, the Court finds

the ALJ reversibly erred by failing to adequately explain several of his findings.

Because these errors potentially affected nearly every aspect of the ALJ's analysis,

the Court remands this case for renewed analysis starting at step three.

### A.    Medical Opinions: Plaintiff establishes consequential error as to her knee and CTS impairments.

Plaintiff alleges that the ALJ "improperly rejected multiple medical opinions

limiting [Plaintiff] to sedentary work."[41]

#### 1.  The Applicable Standard

For cases involving disability applications filed before March 27, 2017, the

role and status of a medical opinion's author are important considerations when

---

[38] *Molina*, 674 F.3d at 1115 (cleaned up).

[39] *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009).

[40] *See* ECF No. 17 at 7.

[41] ECF No. 17 at 2.

assigning weight to that opinion.  The Court of Appeals for the Ninth Circuit laid

out the applicable standard in *Garrison v. Colvin*:

> [Courts] distinguish among the opinions of three types of
> physicians: (1) those who treat the claimant (treating
> physicians); (2) those who examine but do not treat the claimant
> (examining physicians); and (3) those who neither examine nor
> treat the claimant (nonexamining physicians).  As a general
> rule, more weight should be given to the opinion of a treating
> source than to the opinion of doctors who do not treat the
> claimant.[42]  While the opinion of a treating physician is thus
> entitled to greater weight than that of an examining physician,
> the opinion of an examining physician is entitled to greater
> weight than that of a non-examining physician.[43]
>
> If a treating or examining doctor's opinion is contradicted by
> another doctor's opinion, an ALJ may only reject it by providing
> specific and legitimate reasons that are supported by substantial
> evidence.  This is so because, even when contradicted, a treating
> or examining physician's opinion is still owed deference and will
> often be entitled to the greatest weight even if it does not meet

---

[42] *See also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("Generally, we give more

weight to medical opinions from your treating sources, since these sources . . . may

bring a unique perspective to the medical evidence that cannot be obtained from

the objective medical findings alone or from reports of individual examinations,

such as consultative examinations or brief hospitalizations. . . . We will always give

good reasons in our notice of determination or decision for the weight we give your

treating source's medical opinion.").

[43] *See also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("[B]ecause nonexamining

sources have no examining or treating relationship with you, the weight we will

give their medical opinions will depend on the degree to which they provide

supporting explanations for their medical opinions.").

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 9

the test for controlling weight. An ALJ can satisfy the "substantial evidence" requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.

Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion.[44]

Here, Plaintiff specifically challenges the weight assigned by the ALJ to two of Plaintiff's treating physicians: Drs. Wagner and Opara.

2. Drs. Wagner & Opara's Physical Functional Evaluations

In August 2018, treating physician William Wagner, DO, completed a physical functional evaluation on a form supplied by the Department of Social and Health Services.[45] About one year later, in July 2019, another treating physician, James Opara, MD, also conducted a physical functional evaluation and filled out the same form.[46] When assessing how Plaintiff's diagnosed physical impairments would affect basic work activities, Dr. Wagner opined that Plaintiff's knee problems

_____

[44] *Garrison v. Colvin*, 759 F.3d 995, 1012–13 (9th Cir. 2014) (cleaned up) (internal footnotes added).

[45] AR 690–93.

[46] AR 696–701.

caused severe limitations in sitting, standing, walking, lifting, stooping, and crouching.[47]  Dr. Opara later opined that Plaintiff's knee problems caused only a marked limitation in standing and walking.[48]  But Dr. Opara also found that Plaintiff's bilateral carpal tunnel syndrome caused marked limitations in carrying, lifting, and pushing.[49]  Both doctors indicated that Plaintiff could sustain work at only a sedentary level.[50]

Both doctors' opinions were separately reviewed by one or more independent physicians.  In each case, the reviewing physician concurred with the treating physicians' evaluations, confirming that the listed diagnoses were "supported by available objective medical evidence" and that "the severity and functional limitations [were] supported by available medical evidence."[51]  But the record also

---

[47] AR 692.  Dr. Wagner noted that Plaintiff had "difficulty walking, standing, bending," that x-rays from June 2018 showed "severe osteoarthritis of both knees," and that Plaintiff was awaiting knee surgery. AR 692–93.

[48] AR 697.

[49] AR 697.

[50] AR 693, 698. *See also id.* (defining sedentary work as being able to walk or stand only for brief periods and able to lift 10 pounds maximum and frequently lift or carry lightweight articles).

[51] AR 694 (Sept. 2018: Arild Lein, MD, reviewing and agreeing with Dr. Wagner's Aug. 2018 evaluation); 702 (Aug. 2019: Derek J. Leinenbach, MD, reviewing and agreeing with Dr. Wagner's Aug. 2018 evaluation, Dr. Lein's Sept. 2018 review,

1   contains contradictory medical opinions.[52]  Thus, to reject medical opinions of

2   Plaintiff's treating physicians, the ALJ was required to set forth specific and

3   legitimate reasons supported by substantial evidence.[53]

4       3.  Weight Assigned to the Medical Opinions

5       In conducting the disability analysis, the ALJ assigned little weight to each

6   of Drs. Wagner and Opara's medical opinions, as well as the concurring opinions of

7   the reviewing physicians.[54]  And although not included in the ALJ's explanation for

8   rejecting either Dr. Wagner or Dr. Opara's medical opinions, the ALJ assigned

9   "significant weight" to the two opinions that were rendered by the State agency's

10  reviewing physicians in April 2017 and February 2018.[55]  To the extent this

11  _____

12  and Dr. Opara's July 2019 evaluation). *But see* AR 702 (Aug. 2019: Dr. Leinenbach

13  stating in regard to Dr. Opara's evaluation, "Physical exam lists bilateral carpal

14  tunnel syndrome, fibromyalgia, anxiety, and depression but nothing to

15  substantiate so didn't list.").

16  [52] *See also* AR 112–13, 146–47 (State agency's reviewing physicians, in Apr. 2017

17  and Feb. 2018,  finding exertional and postural limitations to a lesser degree than

18  those found by Drs. Wagner and Opara); AR 115, 149 (same reviewing physicians

19  each finding Plaintiff could engage in work at a light—rather than sedentary—

20  exertional level).

21  [53] *See Garrison*, 759 F.3d at 1012–13.

22  [54] AR 30.

23  [55] AR 30–31.

assignment of weight could be considered a reason for rejecting Drs. Wagner and Opara's opinions, the Court finds the ALJ failed to adequately explain his decision to prioritize these reviewing physicians' opinions over those of Plaintiff's treating physicians.[56]  The April 2017 and February 2018 reviewing opinions not only predate Drs. Wagner and Opara's opinions, they also lack the benefit of an in-person examination, they do not reflect—and are largely inconsistent with—Plaintiff's subsequent treatment and diagnostic history, and they contain a lesser degree of supporting explanations than the opinions of Drs. Wagner and Opara, especially when considering each treating physician's treatment notes in the aggregate.[57]

4.  Rejection of Drs. Wagner and Opara's Knee-Related Opinions

In giving little weight to Dr. Wagner's opinions—all of which related to Plaintiff's diagnosis of bilateral knee osteoarthritis—the ALJ provided the following reasoning:

---

[56] "Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs." *Garrison*, 759 F.3d at 13.

[57] *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (each, in the context of assigning weight to medical opinions, discussing the importance of considerations such as the opportunity for the medical source to conduct an examination, the treatment relationship, to supportability of the opinion, and its consistency with other evidence).

> [T]he evaluation from December 2018 only revealed that the
> claimant had an antalgic gait and mildly limited range of motion
> in the left leg.  Likewise, the following year, in August 2019, the
> claimant had slightly diminished strength in the bilateral knees.
> The imaging has consistently shown severe degenerative
> changes, but no evidence of significant worsening.  Given her
> activities, I find that a limitation to work at the light exertional
> level, with additional limitations, is more consistent with the
> longitudinal record.[58]

Similarly, in rejecting Dr. Opara's opinions relating to Plaintiff's knees, the

ALJ stated as follows:

> [T]he contemporaneous treatment notes indicate that the
> claimant had moderate tenderness in the knees . . . but there
> were no other findings.  Similar findings were noted in May and
> June 2019 as well.  While the imaging of the bilateral knees has
> shown severe degenerative changes, the claimant has noted good
> control of her pain with medication.[59]

a.    *The ALJ failed to provide specific and legitimate reasons for*

*rejecting the medical opinions relating to Plaintiff's knee*

*impairment.*

The ALJ's analysis as to both Dr. Wagner and Dr. Opara is flawed for

several reasons.  First, the ALJ failed to explain how the findings he cites in any

way contradict or otherwise detract from the treating physicians' opinions; rather,

the findings he lists appear consistent with the opinions he rejects.[60]

---

[58] AR 30 (citing AR 620).

[59] AR 30 (cleaned up).

[60] *See Garrison*, 759 F.3d at 1012–13.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 14

Second, by skipping over the plethora of supportive findings in the record and suggesting "there were *no other findings*," the ALJ wrongfully implied the record contained only sparse, minimal medical findings regarding Plaintiff's knee problems.[61]  But, as illustrated further below, the bulk of the medical findings of record are at least consistent with, if not supportive of, Drs. Wagner and Opara's opinions.[62]

Third—setting aside that the ALJ failed to explain why a showing of "significant worsening" was needed in the first place—evidence of "severe degenerative changes" necessarily qualifies as evidence of "significant worsening."[63]  Looking to the most applicable entries, the Merriam-Webster Dictionary defines "degenerative" as "of, relating to, involving, or tending to cause degeneration"; it in turn defines "degeneration" to include "progressive

---

[61] AR 30 (emphasis added). *See Garrison*, 759 F.3d at 1018 (rejecting the ALJ's use of a few "singled out" reports to discredit a claimant under the clear-and-convincing standard, stating that the data points the ALJ chooses "must *in fact* constitute examples of a broader [pattern]").

[62] Indeed, in the very records the ALJ cited to support his rejection of Dr. Opara's opinion, the doctor had also found Plaintiff's range of motion "limited by painful motion" for both knees. AR 701, 705, 723, 735.

[63] *See Degenerative* and *Degeneration*, Merriam-WebsterDictionary.com, Medical Definition entries, https://www.merriam-webster.com/dictionary/ (last visited Feb. 7, 2022).

deterioration of physical characters from a level representing the norm of earlier generations or forms" as well as "deterioration of a tissue or an organ in which its vitality is diminished or its structure impaired."  Under their natural meanings, any degenerative change is a change for the worse, and anything considered severe is at least significant.  Nothing in Plaintiff's medical records suggests the authoring physicians meant differently.

Fourth, the ALJ failed to articulate which of Plaintiff's activities were at issue or how they were inconsistent with the doctors' opinions.[64]  Just as is true with a party's unsupported assertion, the Court may not "comb the administrative record to find specific conflicts" for the purpose of upholding an ALJ's general statement or finding concerning an alleged inconsistency.[65]

Fifth and finally, the ALJ erred by asserting, falsely, that Plaintiff had "noted good control of her pain with medication" in relation to her knee pain.[66]  In support of this statement, the ALJ cited to Dr. Opara's entries from August and

---

[64] *See Garrison*, 759 F.3d at 1012–13.

[65] *Cf. Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (noting, in the context of assessing claimant credibility, that courts are constrained to review the reasons the ALJ asserts); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace.").

[66] AR 30.

1    September 2019.[67]    But neither of those entries indicate that Plaintiff's knee pain

2    (or CTS) were well controlled by medication.   Instead, both entries arise in the

3    context of Plaintiff following up on her fibromyalgia, with the notes stating she

4    reported her *fibromyalgia* was well controlled by medication.[68]  In the September

5    2019 note, Dr. Opara even observed that "the bilateral knee osteoarthritis is

6    *getting worse* with the cold weather," and he indicated that Plaintiff "will have

7    surgery done in both knees when she quits smoking."[69]

8               b.    <u>The record contained ample medical findings supporting the</u>

9                    <u>doctors' medical opinions regarding Plaintiff's knee problems.</u>

10          Because the ALJ's primary justification for rejecting Drs. Wagner and

11   Opara's opinions was an alleged lack of supportive medical findings,[70] to illustrate

12

13

14   _____

15   [67] AR 30 (citing to AR 731 & AR 734).

16   [68] AR 731 (Aug. 2019: noting in the context of discussing her referral for

17   fibromyalgia, Plaintiff reported "the Gabapentin is helping her nerve pain but

18   makes her drowsy"); AR 734 (Sept. 2019: noting that, in relation to Plaintiff's

19   fibromyalgia, diabetes mellitus, and depression, "She is taking her medications as

20   prescribed and doing well. . . . She is no longer having frequent exacerbation of her

21   musculoskeletal pain since she started taking the Lyrica.").

22   [69] AR 734 (emphasis added) (cleaned up).

23   [70] *See* AR 30–31.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 17

1  how the record belies the ALJ's proffered reasoning, the Court sets forth below

2  several examples of knee-related medical findings.[71]

3  • July 2015: "Noted crepitus on flexion and extension of both knees."[72]  Imaging
4    showing "[s]evere left tricompartment osteoarthritis with varus" and
      "[m]oderate right tricompartment arthritis with joint effusion."[73]

5  • Aug. 2015: "There is moderate patellofemoral crepitation bilaterally and pain
      with patellar grind, right greater than left."[74]

6  • July 2016: "Severe tricompartment osteoarthritis with varus.  Large right
7    effusion."[75]

   • Oct. 2017: Positive findings for crepitus, joint pain, joint swelling, joint
8    tenderness, and popping.[76]

9  • Jan. 2018: Plaintiff "walked with a wide-based gait and notable bowing of her
      knees."[77]

10 • June 2018: "There is severe bilateral medial femorotibial joint space
      narrowing, subchondral sclerosis and marked marginal spurring.  There is
11   bilateral moderate lateral femorotibial joint space narrowing with marginal
      spurring. . . .  There is severe lateral and moderate left knee medial

12

13 ──────────────

14 [71] The examples of supportive findings are only to highlight deficiencies in the

15 ALJ's proffered reasons.  The record also contains several medical findings—many

16 of which were not mentioned by the ALJ—that could reasonably be interpreted as

17 cutting against Plaintiff's claims.

18 [72] AR 420.

19 [73] AR 459.

20 [74] AR 435.

21 [75] AR 581.

22 [76] AR 541.

23 [77] AR 569.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 18

patellofemoral osteoarthritis."[78]  "Radiographs obtained today show bone-on-bone medial compartment arthrosis of both knees. There is moderately advanced patellofemoral arthrosis on the right and fairly severe patellofemoral arthrosis on the left."[79]

- Dec. 2018: "Severe degenerative changes of the left knee."[80]

- Mar. 2019: "Patient does have severe osteoarthritis of the knee . . . but she reports the surgery is on hold until patient is in a more stable situation."[81]

- Apr. 2019: Impressions including "[s]evere bilateral medial femorotibial and lateral left knee patellofemoral osteoarthritis," as well as "[b]ilateral moderate lateral femorotibial and left knee medial patellofemoral osteoarthritis."[82]

- Aug. 2019: Both knees demonstrating "severe medial compartment joint space loss with near bone-on-bone contact," mild and moderate "lateral patellofemoral compartment joint space loss," and moderate and large "osteophytes are noted of all compartments."[83]

- Sept. 2019: Physical therapist noting during initial assessment, "Objective exam reveals impairments with pain, muscle spasm, reduced ROM, difficulty walking and standing. These impairments are causing functional limitations with standing, walking, bending, lifting, pushing and pulling, which are restricting this patient's ability to participate in ADL's and gainful employment."[84]

///

//

/

---

[78] AR 578–79.

[79] AR 655.

[80] AR 620.

[81] AR 590.

[82] AR 579.

[83] AR 685.

[84] AR 773–74.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 19

1

2

         c.    *Remand is required for the ALJ to reevaluate the medical*

            *opinions concerning Plaintiff's knee impairment.*

3       In rejecting all of Dr. Wagner's medical opinions and those of Dr. Opara's

4  opinions concerning Plaintiff's knee impairment, the ALJ failed to provide specific

5  and legitimate reasons, much less "a detailed and thorough summary of the facts

6  and conflicting clinical evidence" along with explanations as to why his own

7  interpretations, rather than those of a treating physician, were correct.[85]  It is

8  unclear whether Plaintiff would still be employable if the additional knee-related

9  limitations, by themselves, were included in the RFC determination.[86]

10  Accordingly, remand is appropriate, and the ALJ is instructed on remand to

11  reevaluate the medical opinions relating to Plaintiff's knee and CTS impairments.

12      5.  Rejection of Dr. Opara's Opinions Relating to CTS

13       In rejecting Dr. Opara's marked limitations from Plaintiff's CTS, the ALJ

14  again relied on an asserted lack of supporting medical findings, saying, "the

15  contemporaneous treatment notes indicate that the claimant had . . . positive

16

      —————————————

17  [85] *See Garrison*, 759 F.3d at 1012–13; *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th

18  Cir. 2020).

19  [86] *See* AR 88–92 (vocational expert opining that being limited to sedentary work

20  *and* only occasionally handling, fingering, and feeling objects with both hands

21  would bar competitive employment, saying, "I am not aware of any jobs to offer at

22  the sedentary level that would only require occasional handling, fingering, and

23  feeling.").

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 20

Tinel's signs bilaterally, but there were no other findings."[87]  Yet, in the very

records the ALJ cites, in addition to the Tinel's signs, Dr. Opara also found positive

Phalen signs.[88]  Further, contrary to what the ALJ implied, the medical record does

contain other medical findings supportive of the opined CTS-related limitations.[89]

Indeed, soon after Dr. Opara conducted his evaluation of Plaintiff, a nerve-

conduction study confirmed that she had "moderate median neuropathy at both

wrists, consistent with bilateral carpal tunnel syndrome"—a finding which

provided the specialist with sufficient objective medical evidence to recommend the

more aggressive treatment of sequential bilateral carpal tunnel release surgery.[90]

The ALJ also erred in stating that Plaintiff "underwent right carpal tunnel

release surgery" prior to the administrative hearing.[91]  The ALJ's confusion is

perhaps understandable,[92] but close examination of the record reveals that

---

[87] AR 30.

[88] AR 701, 705, 723, 735.

[89] *See, e.g.*, AR 488, 490 (June 2015: "Decreased sensation in her right hand

especially greater than the left exacerbated by wrist flexion."); AR 679 (Aug. 2019:

"Positive for tingling and weakness.").

[90] AR 796.

[91] AR 29–30.

[92] *See* AR 48 (counsel representing that "she had the carpal tunnel release finally

just January 24, 2020"); AR 50 (counsel stating that "they did the carpal tunnel

release on the right"); AR 57 (Plaintiff answering "yes" when asked if she "had the

1   although Plaintiff was *scheduled* for carpal tunnel release surgery in January

2   2020, as of the date of the administrative hearing, she had never undergone the

3   procedure.[93]  Importantly, by that point, the medical record contained far more

4   detailed medical findings supporting Dr. Opara's CTS-related opinion, many of

5   which went unaddressed by the ALJ.[94]  Therefore, and because it is unclear to

6

7   _____

8   release here last month, correct, on your right?").  *But see* AR 57 (When asked, "You

9   already had it, right, on your right?", Plaintiff responding, "No.  I went to the

10  hospital and I checked in and stuff but something was like not okay with me and

11  . . . we had a discussion and he was explaining some stuff to me and so we had to

12  cancel it.").

13  [93] *See* AR 848 (Jan. 23, 2020: Plaintiff "presents to our clinic today for a preop

14  examination.  [She is] scheduled for a right carpal tunnel release on 1/24/2020.");

15  AR 847–48 (Jan. 24, 2020: "Endorsed coffee w/ cream at 0400; marijuana

16  yesterday, and methamphetamines 5 days ago.  Reinforced importance of

17  aspiration avoidance . . . .  Ultimately, patient elected to cancel herself because she

18  had plans later in the day and was unwilling to endure the delay for safety . . . .");

19  *cf. also* AR 28 (ALJ noting, "She also testified that she was not able to undergo

20  right carpal tunnel release due to high blood pressure.").

21  [94] *See, e.g.*, AR 756 (Dec. 2019: "clinical presentation is consistent with carpal

22  tunnel syndrome, which was confirmed by nerve study."); AR 866 ("She has

23  decreased grip strength bilaterally.  She has a degree of thenar eminence atrophy

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

what extent the ALJ's mistaken belief influenced his analysis,[95] the ALJ is

instructed on remand to reevaluate Plaintiff's carpal tunnel syndrome and its

effects at each step of the disability analysis, including while assessing how much

weight to assign to Dr. Opara's related medical opinions.

6. Rejection of Dr. Opara's Opinions Relating to Fibromyalgia, Anxiety, and
   Depression

In addition to the physical limitations already discussed above, Dr. Opara

opined in his July 2019 evaluation of Plaintiff that her fibromyalgia would cause

marked limitations in lifting, carrying, and pushing.[96]  Dr. Opara further asserted

that her anxiety and depression would each cause severe limitations in "obeying

instructions" and "working with others."[97]  The ALJ adequately explained why he

assigned little weight to these opinions.

---

present bilaterally.  She has a positive Phalen's test bilaterally at less than 10

seconds.").

[95] If not for this fundamental misunderstanding, the ALJ's other errors in

assessing the CTS-related medical opinions might have been considered harmless.

Unlike with her knee problems, the Plaintiff did indeed report that her CTS was

well controlled by medication, and the ALJ cited to this finding elsewhere in his

decision. *See* AR 27, 29; *see also* AR 661 (June 2018: "She has been taking

Gabapentin for her carpal tunnel syndrome and reports it has been effective.").

[96] AR 697.

[97] AR 697.

1

2

3

4

5

6

7

8

9

10

11

12

Impairments are not disabling if they "can be controlled effectively with medication."[98]  The ALJ correctly noted that Plaintiff reported control of her fibromyalgia through medication.[99]  The repeated reports of well-controlled symptoms provide the requisite substantial evidence supporting the ALJ's rejection of Dr. Opara's asserted limitations relating to fibromyalgia, especially when considering the general lack of remarkable findings as well as the fact that Plaintiff complained about, and sought treatment for, her fibromyalgia far less frequently and to a lesser degree than she did in relation to her knee problems and CTS.

As to Plaintiff's anxiety and depression, the ALJ accurately pointed out that "regarding [Plaintiff's] mental impairments, the observations of her by Dr. Opara were generally unremarkable other than the appointment in July 2019," and that

13

14

15

16

_____

17

18

19

20

21

22

23

[98] *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

[99] AR 60; *see also, e.g.*, AR 731 (Aug. 2019: reporting at follow-up appointment for fibromyalgia that she was "doing well" and that "the Gabapentin is helping her nerve pain but makes her drowsy"); AR 733 (Aug. 2019: Dr. Opara noting, "Her fibromyalgia is stable now . . . ."); AR 734 (Sept. 2019: "She is taking her medications as prescribed and doing well. . . . She is no longer having frequent exacerbation of her musculoskeletal pain since she started taking the Lyrica.").

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 24

Plaintiff "reported good control of her depression."[100]  Additionally, the ALJ

reasonably gave greater weight to the mental-health findings provided by

Dr. Bartell, who was board certified in psychiatry and had conducted a

comprehensive psychiatric evaluation of Plaintiff in January 2018.[101]  In contrast

to the severe limitations later suggested by Dr. Opara, Dr. Bartell had opined that

Plaintiff's depression and irritability only mildly impaired her ability to "accept

instructions from supervisors" and "to interact with coworkers, and the public."[102]

Given this, substantial evidence supports the ALJ's rejection of Dr. Opara's

opinions, instead finding that Plaintiff's anxiety and depression did not

significantly limit her ability to perform basic work activities.[103]

---

[100] AR 25–26, 30.  *See also, e.g.*, AR 661 ("[S]he is taking Sertraline for depression

and states it has been effective."); AR 734 (Aug. 2019: "She is taking her

medications as prescribed and doing well.").

[101] AR 26. *See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) (An ALJ should "generally

give more weight to the medical opinion of a specialist about medical issues related

to his or her area of specialty than to the medical opinion of a source who is not a

specialist.").

[102] AR 572.  Dr. Bartell also opined that Plaintiff's "ability to deal with the usual

stress of the workplace" was "moderately impaired by her depression and

irritability." *Id.*

[103] AR 26, 30.

1

2

**B.    Step Three: Plaintiff establishes consequential error as to her knee and CTS impairments and Listings 1.02A and 1.02B.**

3

4

5

6

7

8

9

Plaintiff challenges several of the ALJ's findings at step three.  For purposes of step three, the listings describe the characteristics of each impairment. Each description includes the "symptoms, signs and laboratory findings" that make up the characteristics of that listed impairment.[104]  If a medically determinable impairment is found severe at step two but is not among those listed, the ALJ must determine whether the claimant's impairments—separately or in combination—medically equal a listing.

10

11

12

13

14

15

16

17

> To *meet* a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim.  To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment, or, if a claimant's impairment is not listed, then to the listed impairment "most like" the claimant's impairment.
> If a claimant suffers from multiple impairments and none of them individually meets or equals a listed impairment, the collective symptoms, signs and laboratory findings of all of the claimant's impairments will be evaluated to determine whether they meet or equal the characteristics of any relevant listed impairment.[105]

18

19

20

21

[104] 20 C.F.R. §§ 404.1525, 416.925.

22

[105] *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) (cleaned up) (emphasis in

23

original); 20 C.F.R. §§ 404.1526, 416.926.

1    1.   Plaintiff's Knee Impairment and Listing 1.02A

2         The ALJ found that Plaintiff's "bilateral knee impairments do not meet or

3    medically equal Listing 1.02A (major dysfunction of a joint) because there is no

4    indication in the record that the claimant is unable to ambulate effectively."[106]

5    Plaintiff challenges this finding, arguing that the ALJ erred by not providing

6    sufficient analysis.[107]  The Court agrees.

7         As relevant here, Listing 1.02A requires evidence of major joint dysfunction

8    that is characterized by "gross anatomical deformity (e.g., subluxation, contracture,

9    bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with

10   signs of limitation of motion or other abnormal motion of the affected joint(s), and

11   findings on appropriate medically acceptable imaging of joint space narrowing,

12   bony destruction, or ankylosis of the affected joint(s)," which—with the knees—

13   must result in the "inability to ambulate effectively, as defined in 1.00B2b."[108]  The

14   relevant portions defining and explaining the phrase "inability to ambulate

15   effectively" state as follows:

16        Inability to ambulate effectively means an extreme limitation of
          the ability to walk; i.e., an impairment(s) that interferes very
17        seriously with the individual's ability to independently initiate,
          sustain, or complete activities. Ineffective ambulation is defined
18        *generally* as having insufficient lower extremity functioning to
          permit independent ambulation without the use of a hand-held
19        assistive device(s) that limits the functioning of both upper
          extremities. . . .

20   _____

21   [106] AR 27.

22   [107] ECF No. 17 at 15–16.

23   [108] Listing 1.02A.

                    ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 27

1

2

3

4

5

6

7

8
> To ambulate effectively, individuals *must be capable of sustaining a reasonable walking pace over a sufficient distance* to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, *but are not limited to*, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block *at a reasonable pace on rough or uneven surfaces*, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps *at a reasonable pace* with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.[109]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
Contrary to the ALJ's assertion, the record contains at least some indications—beyond the reasonable inferences drawn from various medical opinions—suggesting that Plaintiff cannot ambulate effectively.[110]  Although a reasonable ALJ might have rejected such evidence after addressing it and explaining why other competing evidence was more compelling, the ALJ provided no such analysis here, and the record could be reasonably interpreted either way. Because the Court is left without an adequate explanation supported by

---

[109] Listing 1.00B2b (cleaned up) (emphasis added).

[110] *See, e.g.*, AR 332 (Sept. 2017: Plaintiff's daughter writing that Plaintiff "isn't able to do the things she enjoys most like walk, clean, cook, work even exercise."); AR 569 (Jan. 2018: Dr. Bartell noting that Plaintiff "walked with a wide-based gait and notable bowing of her knees."); AR 768 (Sept. 2019: physical therapist finding "[a]ntalgic gait with reduced knee flexion and significant trendelenberg gait on the right more than the left.").

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 28

1    substantial evidence, and because a different finding would have likely led to a

2    different outcome, the Court finds the ALJ reversibly erred.[111]

3              2.  Plaintiff's CTS Impairment and Listing 1.02B

4    For the ALJ's step-three analysis of Plaintiff's CTS, he stated as follows:

5            With regard to the claimant's carpal tunnel syndrome, while
         there is no specific listing, it is considered to be a neurological
6         impairment and it has been evaluated under the criteria of
         Section 11.00.  As there is no evidence of disorganization of
7         motor function, as defined by the regulations, the claimant's
         symptoms of carpal tunnel do not medically equal any listed
8         impairment.  I have also considered the claimant's symptoms
         under listing 1.02B (major dysfunction of a joint); however, it
9         appears from the record that the claimant is able to perform fine
         and gross movements effectively.  For example, she reported
10        that she is able to feed herself, she is able to do household
         chores, and she is able to drive a car.[112]

11

12   Plaintiff argues that the ALJ erred by not providing sufficient analysis

13   regarding her ability to perform gross and fine movements effectively with her

14   upper extremities.[113]  And, unlike with fibromyalgia and Listing 14.09D, Plaintiff

15   did specifically raise and push for disability based on her CTS and Listing 1.02.[114]

16

17   _____

18   [111] *Garrison*, 759 F.3d at 1010 ("[Courts] review only the reasons provided by the

19   ALJ in the disability determination and may not affirm the ALJ on a ground upon

20   which he did not rely."); *see Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015).

21   [112] AR 27.

22   [113] ECF No. 17 at 15.

23   [114] AR 50.

1    The definition for the "inability to perform fine and gross movements

2    effectively" speaks to an impairment that "interferes very seriously with the

3    individual's ability to independently initiate, sustain, or complete activities," noting

4    the term applies only if the claimant is incapable of "*sustaining* such functions as

5    reaching, pushing, pulling, grasping, and fingering to be able to carry out activities

6    of daily living."[115]  Among the nonexclusive list of examples of evidence of an

7    inability to perform fine and gross movements effectively, the definition includes

8    "the inability to sort and handle papers or files" and "the inability to place files in a

9    file cabinet at or above waist level."[116]

10    Reconsideration of the related medical opinions and Plaintiff's symptom

11    testimony may impact the ALJ's analysis; therefore, the Court need not assess the

12    sufficiency of the ALJ's stated reasons here.  The Court notes, however, that the

13    ALJ provided scant analysis regarding the extent to which Plaintiff's CTS

14    impairment affected functional abilities such as reaching, pushing, pulling,

15    grasping, and fingering—particularly on a sustained basis in a work-like setting.

16    The ALJ is instructed on remand to reevaluate Plaintiff's CTS at step three.

17    3.  Plaintiff's Fibromyalgia Impairment and Listing 14.09D

18    In his step-three analysis, the ALJ stated, "Although there is no specific

19    medical listing regarding the claimant's fibromyalgia symptoms, I have

20    nonetheless considered its effects on each body system included in the listings, and

21    ────────────────

22    [115] Listing 1.00B2c (emphasis added).

23    [116] Listing 1.00B2c.

[find] that the evidence does not show that the claimant's fibromyalgia symptoms are of listing level severity (SSR 12-2p)."[117]  Plaintiff argues that "the ALJ's failure to even consider Listing 14.09D in accordance with SSR 12-2p regarding [Plaintiff]'s fibromyalgia constitutes harmful legal error on its own."[118]  The Court disagrees.

Fibromyalgia is not a condition that generally presents with extensive objective findings and as such it is a challenging condition for not only the medical community to diagnosis but also for an ALJ to assess when considering applications for disability based on this condition.[119]  To provide guidance, Social Security Ruling 12-2p provides diagnostic criteria for fibromyalgia, and, because fibromyalgia is not a listed impairment, the Ruling directs the ALJ at step three to "determine whether [fibromyalgia] medically equals a listing (for *example*, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment."[120]

Here, though the ALJ's analysis of Plaintiff's fibromyalgia was certainly thin, Plaintiff has not established harmful error.  Importantly, Plaintiff bears the

---

[117] AR 27.

[118] ECF No. 17 at 16.

[119] *See* Soc. Sec. Ruling (SSR) 12-2p; *see generally Revels v. Berryhill*, 874 F.3d 648 (9th Cir. 2017); *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004).

[120] SSR 12-2p.

1
2
3
4
5
6
7

burden of proof at step three, and a mere diagnosis does not suffice to establish disability.[121]  An "ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence."[122]  Social Security Ruling 12-2p does not alter this, and merely sets forth one of many potential listings which might apply to a claimant with fibromyalgia.

8
9
10
11
12
13

Plaintiff did not press the ALJ at the administrative hearing regarding Listing 14.09D nor did she present specific evidence at the hearing to demonstrate equivalence.  Even now, Plaintiff fails to demonstrate how her impairments medically meet or equal Listing 14.09D.[123]  Consequently, the ALJ's failure to discuss Listing 14.09D was not erroneous.

14

---

15
16

[121] *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Key v. Heckler*, 754 F.2d 1545, 1549-50 (9th Cir. 1985); 20 C.F.R. §§ 404.1525(d), 416.925(d).

17

[122] *Ford v. Saul*, 950 F.3d 1141, 1157 (9th Cir. 2020).

18
19
20
21
22
23

[123] Plaintiff—not the Court—must flesh out and support her arguments with law and facts. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 930 (9th Cir. 2003) ("We require contentions to be accompanied by reasons."); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.").

1

2

**C.    Plaintiff's Symptom Reports: Reconsideration is warranted as to reports regarding Plaintiff's knee and CTS impairments.**

3

4

      The ALJ found that Plaintiff's medically determinable impairments could "reasonably be expected to cause some of the alleged symptoms."[124]  But the ALJ

5

found that Plaintiff's statements concerning the intensity, persistence, and limiting

6

effects of the reported symptoms were "not entirely consistent with the medical

7

evidence and other evidence in the record."[125]  Again, the Court need not consider

8

the sufficiency of the ALJ's asserted reasons regarding Plaintiff's knee problems

9

and CTS, because reconsideration of the medical opinions may impact the ALJ's

10

analysis regarding Plaintiff's symptom reports.  As such, the ALJ is instructed on

11

remand to reevaluate Plaintiff's symptom reports relating to her knee and CTS

12

impairments.

13

      As to Plaintiff's fibromyalgia, however, for the reasons discussed above, the

14

Court affirms the ALJ's decision to discount Plaintiff's symptom reports related to

15

her fibromyalgia.  The ALJ reasonably relied on the evidence of the control with

16

medication to find her symptom allegations not supported.  This is a specific, clear,

17

and convincing reason to discount her symptom testimony as to her fibromyalgia

18

symptoms.[126]

19

---

20

[124] AR 29.

21

[125] AR 29.

22

[126] *Tommasetti v. Astrue*, 533 F.3d 1035, 1039–40 (9th Cir. 2008) (stating that ALJ

23

may discredit symptom testimony where there is evidence of improvement with

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**D.    RFC Determination: Reconsideration is warranted.**

For the same reasons discussed above, the ALJ is instructed on remand to reevaluate Plaintiff's RFC, particularly in regard to her knee and CTS impairments.  To provide further direction and clarity on remand, the Court lists below additional considerations and instructions for remand.

1.  Medication Side Effects

As Plaintiff correctly pointed out, "the ALJ never considered the side effects of prescription medication, as required."[127]  Among other things, an ALJ is required to consider the "type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms."[128]  Here, Plaintiff testified at the trial that her medications caused drowsiness, and this testimony is supported by other reports and treatment notes interspersed throughout the record.[129]  Thus, the ALJ should have addressed the reported medication side effect, and the ALJ is instructed to do so on remand.

---

treatment); *Fair*, 885 F.2d at 603 (explaining that "an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" may be a sufficient reason to discredit a claimant's symptom testimony).

[127] ECF No. 17 at 20.

[128] SSR 16-3p; *see* 20 C.F.R. §§ 404.1529(c), 416.929(c).

[129] *See, e.g.*, AR 66 (Plaintiff testifying her medication makes her "feel really super tired."); AR 313 (Apr. 2017: reporting cyclobenzaprine makes her feel very sleepy the next day).  Notably, however, the treatment notes—including those during

1

2.  <u>Plaintiff's Need to Ice and/or Elevate Her Legs</u>

2

Though the ALJ noted that Plaintiff reported needing to elevate her knees

3

"at least one hour two times a day," he did not directly address this potential

4

limitation, implicitly rejecting it in assessing Plaintiff's RFC.[130]  Similar to

5

medication side effects, an ALJ is required to consider other measures "used to

6

relieve [the claimant's] pain or other symptoms (e.g., lying flat on [her] back,

7

standing for 15 to 20 minutes every hour, sleeping on a board, etc.)."[131]

8

Here, not only did Plaintiff report needing to elevate and ice her knees, but

9

the medical records also confirm that one of her physicians recommended that she

10

engage in "[c]old therapy for 20 mins three times a day."[132]  Accordingly, the ALJ is

11

instructed on remand to expressly address to what extent, if any, measures taken

12

to relieve Plaintiff's knee pain and other symptoms affect her ability to engage in

13

competitive employment.

14

15

16

_____

17

periods in which she was taking those medications consistently—do not include

18

observations of drowsiness or any similar medication-related impairment, instead

19

consistently noting that Plaintiff was "alert, cooperative, pleasant." *See, e.g.*,

20

AR 592.

21

[130] *See* AR 28.

22

[131] SSR 16-3p; *see* 20 C.F.R. §§ 404.1529(c), 416.929(c).

23

[132] AR 543.

# V.    CONCLUSION

The Court reverses the decision of the ALJ because it was based at least in part on legal error and, in many instances, lacked sufficient explanation for the Court to meaningfully review the ALJ's findings.  Still, an immediate award of benefits would be inappropriate, as the Court finds that "the record as a whole creates serious doubt as to whether [Plaintiff] is, in fact, disabled within the meaning of the Social Security Act."[133]  Therefore, the Court remands this case for further proceedings and a redetermination beginning at step three of the disability analysis.  As part of the redetermination, the ALJ is instructed to, at a minimum, provide detailed and supported analysis regarding the following:

- The weight assigned to the medical opinions relating to Plaintiff's knee and CTS impairments, specifically including Drs. Wagner and Opara's opinions regarding Plaintiff's knee and CTS impairments.  When rejecting any such medical opinion, the ALJ shall expressly note any relied upon inconsistencies between the doctor's findings and the other evidence of record—specifically identifying and analyzing any of Plaintiff's reported activities that are perceived as inconsistent—as well. The ALJ shall also specify how each such opinion was considered when assessing Plaintiff's RFC.

- Plaintiff's credibility and the significance of her symptom reports, specifically regarding her knee and CTS impairments.

---

[133] *Garrison*, 759 F.3d at 1021.

- Whether Plaintiff's impairments, whether separately or in combination, meet or equal any listing at step three.  In doing so, the ALJ shall expressly analyze Plaintiff's knee impairment under Listing 1.02A as well as Plaintiff's CTS impairment under Listing 1.02B.
- Reported side effects of Plaintiff's medications, specifically including drowsiness.
- Measures taken to relieve Plaintiff's impairment-related pain and other symptoms, specifically including elevating and/or icing her knees.
- Plaintiff's RFC, including any limitations arising from Plaintiff's knee and CTS impairments.

Accordingly, **IT IS HEREBY ORDERED**:

1. The decision of the ALJ is **REVERSED** and this matter is **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings as set forth above.

2. Plaintiff's Motion for Summary Judgment, **ECF No. 17**, is **GRANTED**.

3. The Commissioner's Motion for Summary Judgment, **ECF No. 19**, is **DENIED**.

////

///

//

/

4.    The Clerk's Office shall enter **JUDGMENT** in favor of Plaintiff.

5.    The case shall be **CLOSED**.

**IT IS SO ORDERED.**  The Clerk's Office is directed to file this Order and provide copies to all counsel.

**DATED** this 18th  day of February 2022.

_____s/Edward F. Shea_____
EDWARD F. SHEA
Senior United States District Judge